*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BECKY COOPER,

　　　　　　　　*Plaintiff-Appellant,*

　　　　*v.*

LIFE INSURANCE COMPANY OF NORTH AMERICA,
ACE INA LONG TERM DISABILITY PLAN, and ACE
INA HOLDINGS, INC.,

　　　　　　　　*Defendants-Appellees.*

No. 06-5735

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 05-00111—Curtis L. Collier, Chief District Judge.

Argued: January 30, 2007

Decided and Filed: May 16, 2007

Before: GILMAN and SUTTON, Circuit Judges; TARNOW, District Judge.[*]

---

## COUNSEL

**ARGUED:** Eric L. Buchanan, ERIC BUCHANAN & ASSOCIATES, Chattanooga, Tennessee, for Appellant. Cameron S. Hill, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, Chattanooga, Tennessee, John P. Konvalinka, GRANT, KONVALINKA & HARRISON, Chattanooga, Tennessee, for Appellees. **ON BRIEF:** R. Scott Wilson, ERIC BUCHANAN & ASSOCIATES, Chattanooga, Tennessee, for Appellant. Cameron S. Hill, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, Chattanooga, Tennessee, Cynthia J. Cutler, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, Nashville, Tennessee, Tonya K. Cammon, GRANT, KONVALINKA & HARRISON, Chattanooga, Tennessee, for Appellees.

　　GILMAN, J., delivered the opinion of the court, in which TARNOW, D.J., joined. SUTTON, J. (pp. 15-18), delivered a separate opinion concurring in part and dissenting in part.

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

———————————

## OPINION

———————————

RONALD LEE GILMAN, Circuit Judge. Becky Cooper appeals from an adverse judgment in her suit for long-term disability insurance benefits. Her employer's plan is subject to the provisions of the Employee Retirement and Income Security Act (ERISA). Because we conclude that the decision of Life Insurance Company of North America (LINA), the plan administrator, to deny long-term disability benefits to Cooper was arbitrary and capricious, we **REVERSE** the judgment of the district court and **REMAND** the case for entry of an order requiring LINA to award benefits retroactive to the date on which Cooper's short-term disability benefits ceased, and for such incidental relief as the district court may find appropriate in light of our decision.

## I. BACKGROUND

Becky Cooper worked out of her home as an insurance claims adjuster for a subsidiary of ACE Insurance Co. (ACE) for 21 years. At all times relevant to this appeal, she was covered by both short-term and long-term disability insurance plans administered by LINA. Only the long-term disability plan (the Plan) is presently at issue.

The Plan defines the term "disabled" as follows:

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is either:

1.      unable to perform all the material duties of his or her Regular Occupation or a Qualified Alternative, or

2.      unable to earn 80% or more of his or her Indexed Covered Earnings.

Under the Plan,

[t]he Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy. He or she must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid.

The Plan requires covered employees to satisfy a 180-day elimination period of continuous disability before LINA will pay disability benefits. It further obligates claimants to "provid[e] any information or documents needed to determine whether benefits are payable," and places the burden on them to provide "satisfactory proof" of disability. The Plan also grants LINA the right to conduct a physical examination, at its own expense, of a claimant "as often as it may reasonably require."

In January of 2000, Cooper's lower back was injured in a work-related incident while she was on a business trip. She was reaching from the driver's seat of her car into the back seat when she both felt and heard a popping sensation in her lower back, which was followed by lower-back pain that radiated down her right leg. After testing and evaluation, her physician told her that she had scoliosis, spondylolisthesis, nerve entrapment, and degenerative disc disease. She continued to work until May of 2002, when she had a partial lumbar laminectomy performed. Between May and October of 2002, while recuperating, Cooper received short-term disability (STD) benefits from LINA.

Her recuperation progressed more slowly than her neurosurgeon, Dr. Peter Boehm, had anticipated. The patient, he said, "has suffered a prolong [sic] post operative course with residual pain . . . ." Cooper attempted to return to work in late September of 2002, but Dr. Boehm would not release her to work for more than two to three hours per day. She reported that even that amount of work caused her great pain. On December 19, 2002, Dr. Boehm noted: "In my opinion, this patient is not capable of working for a full 8 hours." He directed her to stop working as of the following month. Prior to the termination of her short-term disability benefits on October 30, 2002, Cooper applied for long-term disability (LTD) benefits under the Plan.

In addition to being seen by Dr. Boehm, Cooper has been treated by Dr. R. Sean Brown, a physical medicine and rehabilitation (PMR) specialist; Dr. David Close, her primary care physician; Dr. Dennis Ford, a pain-management specialist; Dr. Michael Gallagher, a neurosurgeon in the same practice as Dr. Boehm; and Dr. James Osborn, another neurosurgeon. She was also evaluated by Dr. Edward Johnson in April of 2004 in connection with her application for Social Security disability benefits.

In a letter dated October 23, 2002, LINA acknowledged Cooper's application for LTD benefits and informed her that it needed additional information to make a determination on her claim: "To fully understand how your condition prevents you from working, we must obtain your physician's treatment plan, as well as medical information regarding your diagnosis and functional abilities from Dr. Boehm . . . by December 6, 2002." On November 12, 2002, LINA faxed requests to Drs. Boehm, Close, and Ford for "updated medical and office notes from August of 2001 through the present date." Each fax included a request for "objective findings," including "laboratory/procedure reports, office notes, [and] Physical Abilities assessment." The Physical Ability Assessment (PAA) form accompanied these requests.

Dr. Boehm submitted copies of office-treatment notes covering his entire time of seeing Cooper, along with the results of an August 2001 lumbar myelogram. The myelogram report described "[m]arked intradiscal degenerative change," "protrusion type herniation at L2-3," "[m]ulti-level spondylotic changes including Grade I spondylolisthesis L5-S1," and "mild compression to the inferior aspect of the L5 root on the right side." In addition, the myelogram revealed "more advanced degenerative narrowing of the [L4-L5] disc space with a diffuse spondylotic defect crossing the central and descending into the right and left central canals." Notes from Dr. Close are not included in the record and are not at issue in this appeal. Dr. Ford faxed a copy of his notes from a September 2002 outpatient visit, describing Cooper's MRI results and assessing her as having postlaminectomy syndrome, lumbar radiculopathy, degenerative disc disease of her lumbar spine, and lumbar spondylosis. He did not offer any opinion about her functionality or ability to return to work.

LINA sent a second letter to Cooper on November 21, 2002, "advising medica [sic] needed by 12/05/02 or will make claim decision with medical on file." According to LINA's records, Cooper called LINA on December 2, 2002 to ask what additional information was needed for the determination of her claim. She was told that "[LINA] needed functionality defined." After receiving no additional information from Cooper or on her behalf, LINA denied Cooper's application for LTD benefits on December 5, 2002, stating that it had been "unable to determine if [Cooper satisfied] the policy definition of disabled." According to the denial letter, LINA considered the Plan and all of the documents in Cooper's claim file, including Dr. Boehm's medical records for the period of July 2001 to November 2002 and Dr. Ford's medical records from September of 2002.

Karen Wells, the LINA case manager who denied Cooper's claim, reported that "Dr. Boehm states in his September 2002 office visit [notes] that your pain has improved but is not well. He advises . . . that you may return to work in the afternoon 2 to 3 hours a week gradually working into

a longer schedule as your condition permits." Cooper was further told that "[Dr. Boehm] states you have good range of motion of the back and the wound is well healed." But Wells also noted that Cooper's "functional ability to lift, carry, walk, stand, etc. was not supplied to [LINA] by Dr. Boehm" despite two requests to his office to do so and two notices to Cooper that the information was needed. LINA advised Cooper that "[w]ithout documented functionality from your physician, we are unable to determine if you satisfy the policy definition of disabled." Accordingly, her claim was denied. Cooper appealed this determination, pursuant to the Plan's administrative appeal process.

In support of her appeal, Cooper submitted additional treatment notes from Dr. Boehm, a PAA from Dr. Boehm on which certain sections were left blank, documentation from Drs. Brown, Close, and Ford, and a detailed letter from Debby Swanger, the nurse case manager and disability management specialist assigned to Cooper's workers' compensation file by Intracorp, a medical management company, describing Cooper's case and treatment. The report from Cooper's December 2002 lumbar spine MRI reflected "extensive degenerative changes at all levels throughout the lumbar spine." At the L2-L3 level, the MRI revealed "moderate-severe bulging of the disc [that] is broad-based and more prominent, especially on the left exiting foramina and far laterally on the left." Dr. Boehm's notes from January of 2003 reflect that he did not want Cooper to work at all until she completed additional treatment. In the narrative section of the PAA form, Dr. Boehm stated that

> Mrs. Cooper should restrict her work hours to whatever her pain level permits. From a lifting standpoint she may lift 10 pounds occasionally. She should avoid any repetitive bending or heavy lifting [of] anything greater than 10 lbs. and must avoid any significant driving. Obviously such things as crawling or clim[b]ing ladders, etc. should be totally avoided.

On January 16, 2003, Cooper's medical problems were compounded when the car in which she was driving was struck head-on by another car. An x-ray taken at the emergency room revealed "advanced spondylosis" but no spinal fracture. Dr. Brown examined Cooper on January 22, 2003 and instructed her to stay off of work until she completed further evaluation and treatment. A cervical-spine MRI from the day of the car accident revealed a large herniated disc, spondylosis (which differs from spondylolisthesis), and bone spurring in Cooper's cervical spine. In March of 2003, Dr. Brown was of the opinion that she could not perform her normal job duties on a full-time basis. Dr. Brown recommended in May of 2003 that Cooper stay off of work until further notice.

In March of 2003, LINA hired Dr. Kenneth Graulich, a neurologist, to conduct an independent peer evaluation of Cooper's benefits application and to report on whether she was disabled. Specifically, LINA requested that Dr. Graulich address (1) the medical documentation of Cooper's condition and treatment, and (2) whether the medical records in Cooper's file supported her inability to work in a light-duty position. Dr. Graulich attempted to speak with Cooper's treating physicians, leaving messages with both Dr. Boehm's and Dr. Brown's offices on March 13 and again on March 17, 2003. Neither doctor had returned Dr. Graulich's phone calls by March 18, 2003, the date of his report to LINA.

In his report, Dr. Graulich summarized the medical records contained in Cooper's file and the restrictions and limitations that Dr. Boehm had prescribed. He noted that Cooper's occupation was deemed light-duty, meaning that it required "frequent lifting of 10 pounds, occasionally 20 pounds, and frequent walking and standing." In addition, he summarized Cooper's disability questionnaire, where she reported that her job required "prolonged sitting which increases her low back pain and causes her legs to become numb. It also requires driving 4-6 hours, which causes the same symptoms." Cooper reported on the questionnaire that she could drive for only 30 to 45 minutes at a time.

Dr. Graulich concluded that the medical documentation supported Cooper's inability to work at a light-duty position between her May 2002 surgery date and the end of October 2002, but that "it does not support her inability to work from 10/30/02 to the present since I was unable to reach the patient's physicians and I do not know if an FCE [functional capacity evaluation] has been performed." For the same reasons, Dr. Graulich concluded that the "medical documentation does not support the patient's inability to work [from October of 2002] in a full-time sedentary position." Inexplicably, however, his report also stated that "restrictions and limitations of no more than 2-3 hours of work per day and no more than 30 minutes of driving per day would appear reasonable." LINA nonetheless relied on Dr. Graulich's report, despite the inconsistent findings, as the basis for its denial of Cooper's appeal on March 27, 2003.

In May of 2004, at LINA's behest, Cooper applied for Social Security disability benefits. The Social Security Administration determined that Cooper had become disabled on May 3, 2002, the date of her back surgery. As part of her disability application, she was examined by Dr. Edward Johnson, an orthopedist. Dr. Johnson reported finding "[c]omplete collapse of the L5-S1 disc space with a grade 1 to 2 spondylolisthesis of L5 on S1." He also noted "marked calcification" that formed "an auto fusion between L5 and S1." His examination further showed that "there is a complete pedicle break . . . and severe spondylosis of the facet joints at L5-S1 level." Moving along Cooper's spine, Dr. Johnson reported a "15% anterior wedge fracture at L2," and a "complete collapse of L1-L2 and L2-L3 disc spaces with large bone spurs, forming an auto fusion from L1 to L3." His report also stated that the "L3-L4 and L4-L5 disc space is 90% collapsed" and that Cooper has a 10-degree scoliosis of her lumbar spine, an asymmetrical pelvis, and "bilateral calcification of the sacroiliac joints with eburnation and sclerotic changes." From his physical exam of Cooper, Dr. Johnson noted "marked muscle spasm" in her lower back, "restrictions in lumbar motion," and "locking of the right SI joint."

Based largely upon Dr. Johnson's examination and report, the Social Security Administration determined that Cooper was totally disabled. She began receiving disability benefits, including a lump-sum payment of back benefits, in June of 2004.

Cooper then filed a second administrative appeal with LINA in July of 2004. In support of her new appeal, she submitted additional office-visit notes from her treating physicians. The additional office-visit notes included results from a September 2003 MRI ordered by Dr. Boehm. This MRI revealed "marked degenerative disc change . . . which effaces the thecal sac margin anteriorly" at C4-C5, and, at C5-C6, "a broad posterior disc osteophyte complex which is asymmetric to the right and significantly compresses the spinal cord." Cooper also submitted a "medical opinion form" from Dr. Johnson, who opined that Cooper "would have difficulty maintaining active employment other than very sedentary brief periods of work. . . . She can sit, stand or walk for two to three hours." Dr. Johnson noted that Cooper could not work an 8-hour day or a 40-hour week.

In September of 2004, LINA sent Cooper's claim file to Dr. Eddie Sassoon, a physical medicine and rehabilitation (PMR) specialist, for an independent peer evaluation. LINA's physician review referral form directed Dr. Sassoon to review the medical information in Cooper's file, to interview her attending physician, and to provide a written report. Specifically, LINA asked Dr. Sassoon to discuss in his report Cooper's diagnoses, the medical records relating to the severity of her condition, and her functional abilities. He was also instructed to discuss whether the medical documentation supported a finding that Cooper was unable to perform her "full time light occupation as a Liability Claims Specialist during the time period of 10/31/02 to the present," and to determine whether the evidence identified a medical condition of sufficient severity that would have precluded Cooper from working full-time in her occupation during the same time period. Dr. Sassoon attempted to contact the office of Dr. Ford, one of Cooper's treating PMR doctors, on September 14 and 15, 2004, but "did not achieve successful communication with the office."

In his September 19, 2004 report, Dr. Sassoon summarized the medical records in Cooper's file and recapitulated Dr. Graulich's report and recommendation from Cooper's first appeal. Dr. Sassoon also noted that Dr. Boehm had released Cooper to work two to three hours a day in September of 2002 and that her file contained no updated objective data supporting disability status. Moreover, Dr. Sassoon specifically flagged the absence of "evidence of acute neurologic or orthopedic deficits of sufficient severity to preclude light level activity on a full-time basis." Accordingly, he concluded that the medical documentation was insufficient to support a finding that Cooper was disabled as of October 31, 2002.

LINA denied Cooper's second appeal soon thereafter. In a letter dated September 28, 2004, it summarized Dr. Sassoon's report and stated that Cooper was not "disabled" as defined in the Plan. LINA also contended, for the first time, that Cooper had not satisfied the elimination-period requirement of the Plan.

In April of 2005, Cooper filed suit in the United States District Court for the Eastern District of Tennessee. She later moved for judgment on the administrative record. LINA and ACE, as part of their defense, filed separate motions for judicial notice of certain representations that Cooper had made in three separately filed lawsuits—two against ACE, her former employer, and one against the individual with whom she had been involved in the January 2003 automobile accident. These lawsuits asserted or implied Cooper's contemporaneous ability to work, contradicting her claims of disability in the present lawsuit. Cooper moved to strike the motions for judicial notice, claiming that LINA and ACE had failed to establish an exception to the ERISA rules that generally prohibit the court from considering evidence outside the administrative record. She further contended that the motions for judicial notice were untimely, having been filed after the deadline for responsive pleadings to Cooper's motion for judgment on the administrative record.

The district court rendered its opinion in May of 2006. After determining that the arbitrary-and-capricious standard of review was applicable, the court considered Cooper's claims in relation to the Plan's requirements and her documented medical history. The court concluded that LINA's position that Cooper had not satisfied the Plan's elimination-period requirement was based on a misinterpretation of the period as defined in the Plan itself. But the court determined that Cooper's claim failed for other reasons. It first decided that LINA's initial decision to deny benefits was not arbitrary and capricious because the decision was based on Cooper's failure to supply sufficient information rather than on the merits of her claim. As to LINA's denials of the two administrative appeals, the court concluded that both appeals failed on the merits.

The district court considered LINA's reliance on the opinions of Drs. Graulich and Sassoon, the contrary opinions of Cooper's treating physicians, the notes from Dr. Johnson's examination, LINA's failure to conduct its own medical exam of Cooper, and the Social Security Administration's decision to award disability benefits to Cooper. After reviewing all of the evidence in the record, the court concluded that LINA's "decision to deny benefits, although a decision that others may not have made, was not arbitrary and capricious."

The rationality of LINA's decision, according to the district court, turned on the lack of "objective medical evidence" to support a finding of disability in the administrative record. Dr. Sassoon's report was quoted at length by the court, specifically his discussion of the absence of evidence of "updated" studies reflecting "acute neurologic or orthopedic deficits" that would prevent Cooper from returning to work. The court also noted that the administrative record contained "some objective evidence of [Cooper's] disability," but that Dr. Sassoon "explain[ed] well why that evidence was not *satisfactory*." (Emphasis in original.) In addition, the court "accord[ed] great weight" to Cooper's failure to provide an FCE, "despite [LINA's] incessant requests for objective medical evidence of [Cooper's] functional capabilities."

The district court thus denied Cooper's motion for judgment on the administrative record, denied LINA's and ACE's motions for judicial notice as moot, denied Cooper's motion to strike as moot, and sua sponte dismissed all of Cooper's claims. It then entered judgment in the defendants' favor. This timely appeal followed.

## II. ANALYSIS

### A.     Standard of review

We review de novo the district court's disposition of an ERISA action based on the administrative record, and apply the same legal standard as the district court. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998). The district court in this case appropriately reviewed Cooper's suit under the arbitrary-and-capricious standard because the Plan granted discretionary authority to the plan administrator to interpret the Plan's terms and to determine benefits. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-15 (1989) (setting forth the arbitrary-and-capricious standard of review in ERISA cases where the plan administrator has discretionary authority); *Glenn v. Metro. Life. Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006) (applying *Firestone*'s standard of review).

Under this standard, we will uphold the plan administrator's decision "if it is the result of a deliberate, principled reasoning process," *Glenn*, 461 F.3d at 666, and is "rational in light of the plan's provisions." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). But the arbitrary-and-capricious standard of review is not a "rubber stamp [of] the administrator's decision." *Id.* at 661. Rather, this standard requires us to review "the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003).

Where a plan authorizes an administrator "both to decide whether an employee is eligible for benefits and to pay those benefits," it creates "an apparent conflict of interest." *Glenn*, 461 F.3d at 666. Cooper contends that LINA has a "genuine pecuniary conflict of interest" because it both determines whether a disability claim should be allowed and then pays the resulting disability benefits out of its own funds. This apparent conflict of interest applies both to LINA and, according to Cooper, to any consultant or medical expert that the plan administrator hires. In response, LINA argues that any consideration of this issue is subsumed within the arbitrary-and-capricious standard.

This alleged conflict of interest was correctly identified by the district court as a relevant factor that it "must take into consideration in determining whether [LINA's] decision was arbitrary and capricious." The court noted, however, that Sixth Circuit caselaw requires a plaintiff not only to show the purported existence of a conflict of interest, but also to provide "significant evidence" that the conflict actually affected or motivated the decision at issue. *See Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998) (rejecting a sliding-scale application of the arbitrary-and-capricious standard of review where a conflict of interest is present and instead requiring significant evidence of self-interest or bad faith).

Cooper provided no evidence whatsoever that LINA's denial of benefits was motivated by its alleged conflict of interest. She simply asserted and continues to assert that because LINA both decides whether an employee is eligible for disability benefits and then pays those benefits, LINA necessarily has a conflict. But such conclusory statements, without more, do not suffice to render the district court's determination incorrect. *See id.* LINA in fact referred both of Cooper's appeals to independent consulting physicians for review. These physicians were employed and selected by a third-party company, albeit based on selection criteria provided by LINA. In addition, LINA incorporated the additional medical documentation that Cooper submitted into her case file, and reviewed the material as part of its internal appeal process. Accordingly, we conclude that LINA's

dual status as decisionmaker and as benefits dispenser did not in and of itself lead to an arbitrary and capricious determination of Cooper's claim.

**B.        LINA's initial denial of Cooper's claim was not arbitrary and capricious**

The Plan language in the present case explicitly states that a participant is disabled so long as she is "unable to perform all the material duties of his or her Regular Occupation or a Qualified Alternative." A "Qualified Alternative" is defined as an occupation whose "material duties" can be performed by the employee, is located within the same geographic area, is offered to the employee, and pays 80% or more of the employee's "Indexed Covered Earnings." Although the record in this case inexplicably omits a job description or a list of job duties for Cooper's position, it does reflect that her job required her to travel extensively by car for up to six hours at a stretch to visit accident sites. The U.S. Department of Labor classifies Cooper's claims-adjuster position as "light duty," a classification that Cooper does not contest.

LINA argues that it was unable to determine if Cooper fit within the "disabled" definition because her file contained insufficient objective documentation of her functional capacity. Cooper's claim was properly denied, according to LINA, because she failed to provide such documentation despite multiple requests to do so. Cooper, on the other hand, claims that she in fact provided all of the evidence that LINA requested, including a PAA from Dr. Boehm, and that her treating doctors all agreed that her back condition prevented her from working.

The record offers only equivocal support for LINA's contention that it requested PAAs from Cooper's doctors on four separate occasions. In fact, LINA's communications with Cooper's doctors, and with Cooper herself, did not emphasize the need for a PAA. LINA instead made a general request for information about Cooper's diagnosis and treatment, including "laboratory/procedure reports, office notes, [and] Physical Abilities assessment." Along with these requests, LINA provided blank PAA forms to each of the doctors. Drs. Boehm and Ford responded to LINA's request with copies of office-visit notes and procedure results.

Although Dr. Boehm did not submit a completed PAA by December 6, 2002, he submitted one the following week, just after LINA had denied Cooper's initial LTD benefits claim. The form stated that Cooper was able to occasionally lift and carry up to 10 pounds, but that she "should restrict her work hours to whatever her pain level permits . . . and must avoid any significant driving." We are of the opinion that LINA would have acted in an arbitrary and capricious manner if it had denied Cooper's LTD-benefits claim and subsequent appeals solely on the basis of her doctors' alleged failure to supply completed PAAs to LINA. But that is not what occurred.

The Plan permits LINA to request "reasonable" documentation of Cooper's condition and obligates Cooper to comply with such requests. Requiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable. *See Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361 (6th Cir. 2002) (upholding a plan administrator's decision because it was "rational in light of the plan's provisions"). Objective medical documentation of Cooper's functional capacity would have assisted LINA in determining whether she was capable of performing "all the material duties of her Regular Occupation," as required by the Plan's definition of disability. We therefore conclude that LINA's requests were not unreasonable.

LINA's denial letter specifically stated that it had considered the opinions of Drs. Boehm and Ford. And, indeed, a "plan administrator may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006). But LINA was not obligated to blindly accept the treating physicians' opinions either. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)

("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician . . . .").

In the present case, LINA determined that the record was insufficient to support a finding of disability because it lacked objective medical evidence. "Your functional ability to lift, carry, walk, stand, etc. was not supplied to our office by Dr. Boehm," LINA wrote in its denial letter. The letter further stated that "[w]ithout documented functionality from your physician, we are unable to determine if you satisfy the policy definition of disabled."

Indeed, Drs. Boehm and Ford provided treatment records indicating that Cooper's condition was slowly improving, at least as of the date of the initial denial. Dr. Boehm's notes stated that Cooper was to gradually increase her work schedule. The record thus contains sufficient documentation to justify LINA's determination that objective evidence of Cooper's functional capacity was lacking. We therefore conclude that the district court did not err in upholding LINA's initial claim denial under the arbitrary-and-capricious standard of review.

## C.        LINA's denial of Cooper's first administrative appeal was arbitrary and capricious

On administrative appeal, Cooper submitted additional medical evidence in an effort to satisfy LINA's requests for objective documentation of her condition. The evidence included treatment notes from Drs. Boehm and Brown, a PAA from Dr. Boehm, and at least two MRI test results dating from December of 2002 and January of 2003. She also submitted the police report and emergency room records relating to her January 2003 automobile accident.

Although the Plan provides that LINA may, at its own expense, have a claimant examined by a physician of its choice, it chose not to do so. There is nothing in the Plan language, however, that requires LINA to conduct its own medical examination or that bars a file review by a consulting physician in place of a physical exam. Instead, LINA's reliance on file reviewers in its denial of Cooper's administrative appeals is "just one more factor to consider in our overall assessment of whether [LINA] acted in an arbitrary and capricious fashion." *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). We also consider whether the file reviewers are independent medical examiners or are employees of the Plan administrator. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381-82 (6th Cir. 2005) ("[W]hen a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism."). This court has further noted that a plan administrator's failure to conduct a physical examination "may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 295.

In this case, Dr. Graulich reviewed Cooper's claim file, discussed the medical documentation contained therein, and determined that insufficient medical evidence existed to support a finding of disability. The report of Dr. Graulich on Cooper's first appeal summarized the treatment notes from Drs. Boehm, Ford, and Gallagher. Dr. Graulich recounted that Dr. Boehm had filled out a PAA stating that Cooper was able to lift 10 pounds occasionally and could "work to tolerance level." In addition, Dr. Graulich reported that Dr. Boehm subsequently noted that Cooper was unable to tolerate even the two to three hours of work per day that she attempted in late September of 2002. Dr. Boehm supplemented his notes on December 19, 2002 ("In my opinion this patient is not capable of working for a full 8 hours."), on January 13, 2003 ("At this point I would recommend that we [sic] not pursue any work until we determine the efficacy of [a series of] epidural steroid injections [and] until she can become actively involve[d] with her water aerobic therapy."), and on February 10, 2003 ("Becky Cooper was evaluated in the office today. She is not able to return to work.").

The above clarifications are specifically mentioned in Dr. Graulich's report. Dr. Graulich attempted, but failed, to reach Drs. Boehm and Brown by telephone in the days immediately before

he submitted his report. Consequently, he noted that he did not know "if [Cooper] ever had a functional capacity evaluation to confirm her inability to do a light level of labor to include driving." He then determined, without further discussion, that the medical documentation "does not support her inability to work from 10/30/02 to the present."

LINA relied on Dr. Graulich's report in its March 27, 2003 denial of Cooper's first administrative appeal, stating that "[t]he reviewing physician [Graulich] noted that without conversation with your treating physician or a valid Functional Capacity Evaluation (FCE) relative to the period of 10/30/02 through the present, he was unable to conclude that you were unable to perform at a light work level on a full-time basis." This caused LINA to affirm its previous decision to deny Cooper's claim for LTD benefits.

LINA's request for an independent physician review of Cooper's appeal had included the following special instructions:

1.     Please review the attached medical information provided;
2.     Interview the attending physician; and
3.     In your narrative report, please included answers to the questions below.

Those questions included a request to identify and discuss Cooper's diagnosis in detail, including an instruction to "[p]lease contact tx APs," meaning the treating attending physicians.

Dr. Graulich received this request to review Cooper's file some time after March 6, 2003, and was given approximately 10 days to conduct his review. He attempted to contact Drs. Boehm and Brown on March 14 and again on March 17, 2003. His report was dated March 18, 2003. Although the fact that Dr. Graulich made two phone calls to each doctor might indicate the urgency or seriousness of the matter, the record is devoid of evidence that he informed the treating physicians of how important it was to Cooper that they promptly contact him. We find that Dr. Graulich's haste to complete his report in disregard of his explicit instructions to interview Cooper's treating physicians was unreasonable, especially because he allowed so little time before he "pulled the trigger."

This is not to say that Dr. Graulich or any other independent file examiner has to wait indefinitely for a response from a claimant's treating physicians. But the examiner does have to wait a reasonable amount of time and establish that the treating physicians were informed of the importance to their patient of a prompt reply. Here, LINA had directed Dr. Graulich, in two separate instructions, to interview Cooper's treating physicians. He did not do so. Moreover, he inexplicably stated that "restrictions and limitations of no more than 2-3 hours of work per day and no more than 30 minutes of driving per day would appear reasonable" directly after concluding that "the medical documentation does not support the patient's inability to work 10/30/02 through the present in a full-time sedentary position." As further evidence of the problems with Dr. Graulich's report, Cooper's job was not classified as "sedentary," but rather as "light-duty."

In sum, Dr. Graulich failed to interview Cooper's treating physicians despite his explicit instructions to do so, misstated the exertional level of Cooper's job, and contradicted himself as to her ability to engage in full-time work. We thus conclude that LINA acted arbitrarily and capriciously when it relied on Dr. Graulich's report in denying Cooper's first appeal on the basis that the record lacked sufficient evidence to establish disability.

**D.     LINA's denial of Cooper's second appeal was also arbitrary and capricious**

In reviewing Cooper's file on her second administrative appeal, Dr. Sassoon failed to provide a reasonable basis for denying Cooper's claim and, in fact, compounded the errors in Dr. Graulich's report. LINA's request for a second independent physician review included the same three

instructions as provided in its first request to Dr. Graulich, including a direction to interview "the attending physician." Contrary to the singular noun "physician," the request form provided the name, specialty, and phone number information for Drs. Boehm, Brown, Ford, and Osborn, all being Cooper's treating physicians.

In his September 19, 2004 report, Dr. Sassoon summarized the treatment notes of Cooper's doctors, along with the findings from the MRI and x-ray studies. He specifically recounted that Dr. Johnson, who had examined Cooper in connection with her Social Security claim, had noted that Cooper could lift 10 pounds occasionally. But Dr. Sassoon omitted any reference to the immediately preceding sentence of Dr. Johnson's opinion, which stated that "[b]ased on the *objective physical findings* during this exam, it is felt that this woman would have difficulty maintaining active employment other than very sedentary brief periods of work." (Emphasis added.) Dr. Sassoon likewise discussed Dr. Boehm's office-visit notes insofar as they addressed Cooper's ability to perform a straight leg raise, but made no mention of Dr. Boehm's repeated notes that Cooper was unable to work for more than three hours per day after her surgery. Moreover, Dr. Sassoon gave no explanation for why he ignored these portions of the medical evidence in Cooper's file.

He did note, however, that Cooper underwent an MRI in December of 2002 that revealed "no evidence of recurrent disc herniation or acute neurologic impingement." Brain and cervical MRIs, according to Dr. Sassoon, also provided "no evidence of neurological deficits [or] compromise." Dr. Sassoon concluded that Cooper's condition "will be consistent with chronic cervical and lumbar radicular pain and degeneration of the cervical and lumbar spine of moderate degree," but provided no explanation for how those conditions would manifest themselves in her functional abilities. He also agreed with Dr. Graulich that the file lacked updated evidence of Cooper's functional capacity that would confirm her "inability to do a light level of labor, which includes driving activity beyond October 31, 2002."

But like Dr. Graulich, Dr. Sassoon failed to follow LINA's explicit instructions. He notes in his report that he "did contact Dr. Ford on September 14, 2004 and September 15, 2004," but that he "did not achieve successful communication with the office." From this statement, we are unable to determine whether Dr. Sassoon spoke to a member of Dr. Ford's staff, whether he left a message, or whether he was unable to get through to the office at all. Nor is there any evidence that Dr. Sassoon attempted to contact any of the other three treating physicians listed in LINA's request form.

Also like Dr. Graulich, Dr. Sassoon gives no explanation of why the information in Cooper's file, including various test results and statements from no fewer than three physicians that she was unable to work a full eight-hour day, was insufficient to support such a finding. Dr. Sassoon instead summarized those parts of the file favorable to LINA, omitted the parts that tended to support Cooper's claim, and concluded that there was insufficient evidence of disability. LINA then relied on Dr. Sassoon's report in denying Cooper's second administrative appeal, despite his failure to follow LINA's explicit instructions and his omission of certain portions of the evidence in Cooper's file. We conclude that this reliance was unreasonable.

The Plan grants LINA the authority to request "satisfactory proof" of disability, although LINA "may not arbitrarily repudiate or refuse to consider the opinions of a treating physician." *See Glenn*, 461 F.3d at 671. Here, the failure of the independent-review physicians to comply with LINA's instructions or to explain why they had disregarded the opinions of the doctors who had in fact treated Cooper was arbitrary. *See McDonald*, 347 F.3d at 170-73 (holding a plan administrator's denial of benefits to be arbitrary and capricious where the administrator gave no explanation for ignoring the reports of the treating physicians and two independent file reviewers that the claimant was disabled). LINA's reliance on the reports of Drs. Graulich and Sassoon in denying Cooper's two administrative appeals constitutes capricious decisionmaking.

In sum, LINA sought documentation of Cooper's functional capacity, such as the amount of time that she could sit, stand, walk, or drive, but did not inform her that it would accept only one form of such evidence—an FCE. Even after Cooper submitted the requested documentation, including physician office-visit notes, MRI and other test results, and the report of the examining physician for her Social Security benefits, LINA continued to maintain that her claim was insufficiently documented.

Drs. Graulich and Sassoon, moreover, failed to consider all of the medical evidence in Cooper's claim file, disregarded their instructions to speak to Cooper's treating physicians, and then offered conclusory and unsupported statements that the documentation of Cooper's functional capacity was insufficient to support a finding of disability. LINA's reliance on these reports to uphold its denial of Cooper's claim was irrational. We thus conclude that the denial of Cooper's two administrative appeals by LINA was arbitrary and capricious.

**E.      The district court properly dismissed the appellants' motions for judicial notice as moot**

After the district court held that the denials of Cooper's claim by LINA were not arbitrary and capricious, it dismissed LINA's and ACE's motions for judicial notice as moot. At oral argument, the parties disagreed as to whether we could, consistent with ERISA, remand the matter to the district court with instructions to reopen the administrative record. We find, however, that this is not a situation where such an order would be appropriate.

In *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618-19 (6th Cir. 1998), this court clarified when and to what extent a district court may go beyond the administrative record when reviewing a plan administrator's decision. The court is to conduct its review "based solely upon the administrative record." *Id*. at 619. Evidence outside the administrative record may be considered "only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Id*. "This also means that any prehearing discovery at the district court level should be limited to such procedural challenges." *Id*. Neither party in the present case has raised a procedural challenge to the administrator's decisionmaking. As such, consideration of evidence outside the administrative record would be improper. We thus find no error in the district court's dismissal of the motions for judicial notice.

**F.      Cooper's remaining contention is moot**

In light of our determination that LINA's denial of benefits was arbitrary and capricious, we have no need to resolve Cooper's contention that the district court failed to give proper weight to her award of disability benefits from the Social Security Administration. This issue is therefore moot.

**G.      Appropriate remedy**

We must next consider the appropriate remedy. A recent decision from this court concluded that a remand to the plan administrator is appropriate "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006) (brackets and quotation marks omitted). Unlike in *Elliott*, we find no need to remand this matter for additional consideration by LINA because of our conclusion that Cooper has clearly established that she is disabled under the Plan. *See Kalish v. Liberty Mut./Liberty Life Assurance Co.*, 419 F.3d 501, 513 (6th Cir. 2005) (concluding that the appropriate remedy was an immediate award of benefits rather than a remand to allow the plan administrator to consider evidence that it had previously ignored).

We agree with the dissent that an award of disability for back pain should be based on objective medical evidence rather than on the claimant's subjective complaints. But, as set forth in Part I. above, the record in the present case clearly establishes that Drs. Boehm, Brown, and Ford, three of Cooper's treating physicians, based their opinions on objective medical evidence. We are therefore puzzled by the dissent's comments that "the record does not does not show . . . whether Cooper's treating physicans could point to objective medical evidence, as opposed to subjective complaints of pain from their client, that demonstrated a *disabling* condition" (Dissenting Op. at 15), and that an investigation "might reveal that Cooper's treating physicians based their diagnoses solely on Cooper's own testimony—testimony that LINA need not credit." (Dissenting Op. at 17)

The other major point made by the dissent is that Cooper seemingly manipulated the administrative process by concealing a functional capacity evaluation (FCE) that contradicted her disability claim. An examination of the record, however, offers at best equivocal support for this proposition. On March 14, 2006, LINA filed a "Supplement to Motion for Judicial Notice," to which it attached an FCE performed on April 12, 2004. This FCE was done at the behest of ESIS, a subsidiary of ACE, in relation to Cooper's claim for workers' compensation against ACE. The FCE itself reports that

> Ms Cooper *gave a conditionally reliable effort*, with 37 of 44 consistency measures within expected limits. There were significant objectively measured inconsistencies noted during lumbar range of motion, grip strength, and static strength testing. However, a breakdown in mechanics was observed during dynamic lift testing once her safe lifting limit was exceeded.

(Emphasis in original.)

To be sure, the report concluded that the "objectively measured inconsistencies" were "positive indicators for the likelihood of submaximal effort given during these tests." But the very next sentence stated that "a breakdown in spine and lifting mechanics was noted during dynamic lift testing." The FCE, in other words, does not flatly contradict Cooper's disability claim.

Furthermore, in ACE's supplemental motion for judicial notice, filed contemporaneously with and adopting by reference LINA's "Supplement to Motion for Judicial Notice" relating to this same FCE, ACE conceded that

> [a]lthough counsel for ACE *was aware* that Ms. Cooper had undergone a Functional Capacity Evaluation ("FCE") at some point, in relation to one of her myriad claims against ACE or its affiliates or its insurers, counsel for ACE was not able to determine which affiliate or insurer had requested such FCE, for which particular claim the FCE was performed, nor who had possession of the FCE report until March 9, 2006.

(Emphasis added.) What this concession reveals is that at least one of the defendants in the present case had this FCE in its possession during the time that the administrative record was still open, but failed to place the document in the record. Moreover, ACE was aware of the FCE and was, in fact, able to find and produce it, albeit after the administrative record closed.

Neither ACE nor LINA offers any explanation for their failure to find and produce the FCE in time to include it in the administrative record in the present case. Instead, they contend that Cooper "withheld" the information. But they do not, perhaps because they cannot, explain how Cooper withheld information *that they already had*. They offer absolutely no justification for reopening the record in order for them to include information that they were aware of and had in their possession for a period of close to two years prior to the motion for judicial notice.

In sum, we are of the opinion that this case is closer to *Kalish* (where this court directly awarded the claimant benefits) than to *Elliott* (where this court remanded for further consideration) because objective medical evidence supports the opinions of Cooper's treating physicians as well as the opinion of Dr. Johnson, the Social Security Administration's examining physician. The contrary opinions of the reviewing physicians relied on by LINA are not entitled to countervailing weight for the reasons set forth in Part II.C. & D. above.

Plan administrators should not be given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits. They need to properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable. That is not the case here.

The evidence in the record demonstrates that Cooper's physicians never released her to work for more than two to three hours per day. There is no dispute that this was insufficient to fulfill the "material duties" of her job as a claims adjuster. Given the Plan's definition of disability, the unequivocal treatment notes from Cooper's treating physicians and from Dr. Johnson regarding Cooper's extensive physical limitations, and the deficient reports from LINA's file examiners, we conclude that Cooper was entitled to LTD benefits as of October 30, 2002, the date on which her short-term disability benefits ceased. *See, e.g.*, *Glenn*, 461 F.3d at 675 (remanding for reinstatement of benefits retroactive to the date on which they were arbitrarily terminated); *Kalish*, 419 F.3d at 513 (same). We of course recognize that the terms of the Plan permit LINA to require "continued proof" of Cooper's disability for benefits to continue. Our opinion does not limit the applicability of that provision.

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for entry of an order requiring LINA to award benefits retroactive to the date on which Cooper's short-term disability benefits ceased, and for such incidental relief as the district court may find appropriate in light of our decision.

---

### CONCURRING IN PART, DISSENTING IN PART

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. The irregularities of the claim-review process prompt me to agree with the majority that LINA's denial of Cooper's request for long-term-disability benefits was arbitrary and capricious. Yet it is precisely for that reason—that LINA has yet to give Cooper's claim the procedural review it is due—that I cannot understand how the majority would grant the benefits itself rather than following the normal recourse: remanding the case; permitting LINA to comply with these procedures; and allowing the company to exercise its plan-given discretion over the awarding of benefits on a complete record.

*First*, in leapfrogging this process, the majority opinion is internally redundant, if not internally inconsistent. If the problem here is one of medical substance (that the only non-arbitrary conclusion one can draw from the record is that Cooper is disabled), then it does not seem necessary for the majority to devote most of its opinion to matters of procedure (that LINA failed in several respects to give Cooper's claim proper review). If the medical evidence points in just one direction, why concern ourselves with LINA's procedural mistakes in generating that record? And if LINA's procedural mistakes are as numerous as the majority points out (they are), how can we draw one-way conclusions about the medical evidence? The more times LINA lost its way in compiling this record, the more reasons we have to doubt the accuracy of that record.

*Second*, while insurance companies (and perhaps federal courts) may readily handle some medical-disability claims, this is not one of them. Back-pain cases are notoriously hard to pin down: hard for a claimant to connect her complaints of pain to medical evidence; hard for a treating physician to explain how much of the diagnosis arises from objective evidence rather than from subjective complaints; and hard for a reviewing physician to verify the truthfulness of a claimant's complaints. All of this makes it particularly important for plan administrators to use a "deliberate, principled reasoning process" in reviewing benefits claims in this area, *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)—both to allow the administrator to exercise its discretion in a meaningful way and to allow a medically untrained judiciary to exercise its limited review in a meaningful way. For precisely these reasons, when we find a "problem . . . with the integrity of the plan's decision-making process" in a claim of this type, *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006) (internal brackets omitted), we ought to be doubly reluctant to don the white coats ourselves and say that the record permits just one medical conclusion. That is particularly true here where the district court judge who reviewed this case thought that, as a matter of substance and procedure, the benefits decision was not arbitrary and capricious.

*Third*, consider the difficulties of saying that this record permits just one conclusion. It is one thing to say that LINA's doctors should have done more to support their decision; it is quite another to say that this record left these same doctors with only one rational choice: find a disabling condition that precludes full-time work. No one doubts that Cooper suffered a back injury, and objective medical evidence shows as much. What the record does not show is whether Cooper's treating physicians could point to objective medical evidence, as opposed to subjective complaints of pain from their client, that demonstrated a *disabling* condition. We know this is a close case because Cooper and her doctors admitted that she could work some number of hours every day; the issue is whether it could be a full day. And Cooper's doctors did not include the notes from their examinations (or return the phone calls from LINA's doctors) that *might* have conclusively shown that objective medical evidence supported Cooper's subjective view that she could not work full time, just part time.

All of this is important because subjective complaints of back pain by themselves do not compel an administrator to grant disability benefits. *See, e.g.*, *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 382 (6th Cir. 1996) (holding that administrator did not act arbitrarily in discounting claimant's "subjective complaints[, that] are easy to make, but almost impossible to refute"); *Oody v. Kimberly-Clark Corp. Pension Plan*, No. 05-6812, 2007 WL 328794, at *6 (6th Cir. Feb. 1, 2007) (holding that administrator did not act arbitrarily when evidence included subjective complaints and some medical evidence but not "sufficient objective medical evidence"); *Nichols v. Unum Life Ins. Co. of Am.*, 192 F. App'x 498, 504 (6th Cir. Aug. 21, 2006) (holding that administrator did not act arbitrarily in finding that treating physician's assessment "was largely based on her acceptance of [claimant's] descriptions of her medical conditions [neck, arm and back pain], rather than based on an objective assessment of [claimant's] medical history"); *Wical v. Int'l Paper Long-Term Disability Plan*, 191 F. App'x 360, 372 (6th Cir. July 20, 2006) (finding "significant[]" that a reviewing physician said a treating physician's assessment of disability was "lacking an adequate empirical or 'hard' scientific basis beyond [claimant's] subjective complaints of pain"); *Bishop v. Metro. Life Ins. Co.*, 70 F. App'x 305, 309 (6th Cir. July 10, 2003) (per curiam) (upholding administrator's denial of benefits for chronic back pain when claimant's "symptoms seem[ed] out of proportion to object exam findings") (internal quotation marks omitted).

On this record, we are left with more questions than answers. Did Cooper's treating physicians base their conclusions about *disability* (as opposed to injury) on Cooper's subjective complaints of pain or on their own objective findings developed through examination but not disclosed in their notes? The record, as Drs. Graulich and Sassoon fairly concluded, does not say. If Dr. Sassoon had examined Cooper, would he have arrived at the same conclusion? Would a simple conversation with Cooper's treating physicians have convinced Dr. Graulich that Cooper was impaired? Though LINA's doctors asked Cooper for a functional capacity evaluation, which could have put the objective-medical-evidence question to rest, why wouldn't she (or her doctors) supply one? The answer, it turns out, is not that she did not have one. More on that later.

These questions go to the heart of Cooper's disability claim, and it is hardly unreasonable to insist that these questions be answered before an administrator, to say nothing of a court, awards benefits. *See Elliot*, 473 F.3d at 622 (remanding for a new decision based on flaws in the administrator's reasoning process); *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 265 (6th Cir. 2006) (same); *Yonts v. Cont'l Cas. Co.*, 113 F. App'x 669, 672 (6th Cir. Oct. 15, 2004) (same); *see also Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 598 (6th Cir. 2001) (in non-disability ERISA case, noting that remand was proper to correct a procedural error and "expressly refrain[ing] . . . from examining the merits of the dispute"); *cf. Brooking v. Hartford Life & Accident Ins. Co.*, 167 F. App'x 544, 549 (6th Cir. Feb. 16, 2006) (awarding retroactive benefits because the "*uncontested* fact that [claimant] cannot maintain a seated position for more than an hour at a time" makes "work in a sedentary job . . . clearly not possible") (emphasis added).

The question, moreover, is not whether eligibility to work two to three hours a day would allow Cooper "to fulfill the 'material duties' of her job as a claims adjuster." Maj. Op. at 14. Everyone takes that as a given. The question is whether the treating physicians' two-to-three-hours determination is supported by medically conclusive evidence or merely the say-so of the doctors (based on the say-so of the patient). While this record would permit an administrator to award benefits as a matter of discretion, it does not demand it. To conclude otherwise is to contravene the well-established principle that administrators need not award benefits every time a claimant's treating physicians say she is entitled to them. The plan after all gives reasoned discretion to the administrator, not to the claimant's doctors. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832–34 (2003) (holding that ERISA plans need not defer to treating physicians); *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) ("Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another . . . the plan administrator's decision cannot be said to have been arbitrary and capricious . . . .").

Because "[w]e are not medical specialists," *Elliott*, 473 F.3d at 622–23, it is difficult to know what to make of the medical evidence that is in the record. The majority points out, for example, that Cooper's December 2002 magnetic resonance imaging scan showed "moderate-severe bulging of the disc" at L2-L3, Maj. Op. at 4, and that Dr. Johnson's May 2004 exam of Cooper revealed "[c]omplete collapse of the L5-S1 disc space with a grade 1 to 2 spondylolisthesis of L5 on S1," Maj. Op. at 5. While a thorough review of the record and several medical dictionaries might illuminate some of these statements ("spondylolisthesis," it turns out, is the sliding of one vertebra forward relative to another one), federal judges are ill-equipped to wade through this kind of evidence in the first instance, much less to say that it supports one conclusion and one conclusion only—particularly when two doctors have told us otherwise. Add to this the fact that back-pain complaints require medical expertise to connect the dots between injury and disability, and it seems especially inappropriate to overrule the considered judgment of two medical professionals based on our review of the same evidence they reviewed. *See Hansen v. Metro. Life Ins. Co.*, 192 F. App'x 319, 323 (6th Cir. July 3, 2006) (noting, in the context of a denial of disability benefits arising from back pain, that "illness is not to be equated with total disability") (internal quotation marks omitted).

*Fourth*, this ERISA plan entrusts LINA, not the federal judiciary, with discretion to assess whether Cooper is due benefits. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). For this reason, we normally allow administrators to hire and rely on independent medical experts in carrying out this task. *See McDonald*, 347 F.3d at 169. True enough, LINA erred by relying on the opinions of Drs. Graulich and Sassoon when they neither examined Cooper nor spoke with her doctors in this close case. But is it really the case that we would label LINA's decision to deny benefits arbitrary even if the two sets of doctors had spoken, even if LINA had cured any other procedural errors and even if the evidence showed (after those conversations) that the treating physicians did no more than reflexively accept Cooper's subjective complaints of pain? That seems doubtful. It also seems doubtful that we would award Cooper benefits based on the lack of a phone call, especially when we can never know how that conversation would have gone. While we can all agree that it would have been preferable for LINA to do this correctly the first time, the company's errors do not entitle us to exercise plan discretion for the company, particularly when Cooper's doctors and Cooper herself were partly to blame for the gaps in the record—(1) Cooper's doctors because they did not explain why the objective medical evidence supported a finding of disability (as opposed to injury) and because they did not return the phone calls of Drs. Graulich and Sassoon and (2) Cooper herself because she did not produce a pre-existing functional capacity evaluation.

On remand, further investigation might reveal that the conclusions of Cooper's treating physicians are based on objective (but unreported) findings developed through their examinations. It might reveal that Cooper's treating physicians simply disagree with LINA's medical experts on the severity of her condition based on the evidence in the record. Or it might reveal that Cooper's treating physicians based their diagnoses solely on Cooper's own testimony—testimony that LINA need not credit. In any case, the truth obscured by the administrative process can be revealed, and if Cooper is entitled to benefits, she will get them. In the first instance, however, "that judgment is not ours to make." *Elliott*, 473 F.3d at 623.

Any doubt about the appropriate remedy, it seems to me, can be laid to rest by the motion for judicial notice. There, LINA points out, even though it sought additional objective medical evidence regarding Cooper's medical condition during the administrative process, Cooper never produced a reliable and objective method of gauging her condition—a functional capacity evaluation—apparently because it showed that she could in fact work. As *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998), acknowledges, a "district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision," *id.* at 619. *See Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 430 (6th Cir. 2006) ("The *Wilkins* panel foresaw occasions in which the

procedural process of gathering all pertinent information may have broken down at the administrative level and directed the courts to permit discovery in those cases.").

*Wilkins* and *Moore* dealt with efforts by a claimant to introduce evidence that he could not have obtained earlier and that raised questions about the procedural propriety of the administrator's decision. They say nothing about what happens when the shoe is on the other foot—when the claimant has refused to produce highly pertinent information that she concealed from the administrative process. Despite LINA's repeated statements that a functional capacity evaluation would have supplied the objective medical evidence it needed, Cooper never produced the document—which stated that Cooper likely exaggerated her pain, JA 1263 (noting a "likelihood of submaximal effort given during [certain] tests"), that she could return to work immediately, *id.* ("Cooper DOES MEET the strength/lifting/carrying and positional demands of her job."), and that her pain did not restrict her functional abilities, *id.* ("No restrictions are recommended for returning to work."). If we can take notice of a plan administrator's abuse of its procedural obligations under ERISA, *see Wilkins*, 150 F.3d at 619, surely we cannot turn our heads from a claimant's seeming manipulation of the administrative process. That Cooper's former employer (ACE) knew she had undergone an evaluation "at some point" does not change things because it is LINA, not ACE, that administers the plan. It is LINA that must investigate Cooper's eligibility for benefits, and it is LINA that the plan empowers to exercise discretion over these difficult disability determinations. Given the conclusions in Cooper's once-withheld, now-revealed functional capacity evaluation, the "adequacy of [Cooper's] proof is," at the least, "reasonably debatable." Maj. Op. at 14. On this record, the case should be remanded, and the administrator should be able to consider the functional capacity evaluation and any other evidence the parties wish to introduce.

As I see this case, we have correctly identified a serious procedural mistake, then compounded the problem by committing our own procedural mistake—by awarding benefits ourselves without the assistance of a complete record and without the input of the administrator's discretionary judgment. Two procedural wrongs do not make a substantive right. As the majority sees these issues differently, I respectfully concur in part and dissent in part.